## Thomson *against* Hopper.

1 WS 467
21 SC 94

When there are mutual accounts between parties, the items of credit and charge in such accounts, within six years before the commencement of the action, are deemed equivalent to a subsequent promise reviving the debt.

ERROR to the Common Pleas of ———— county.

This was an action on a book account, by Martin Hopper against John Thomson, commenced on the 28th of April 1838, and came into the court below by appeal by the defendant from the judgment of a justice of the peace. The defendant pleaded *non assumpsit, non assumpsit infra sex annos,* and payment, &c.

The facts are sufficiently stated in the charge of the court:

BURNSIDE, President.—Here the action was brought in April 1838. The first item in the plaintiff's account is in 1830, and the account is continued to the year 1837. The defendant's ac-

[Thomson v. Hopper.]

count contains about as many items as the plaintiff's. It commences in 1827, and is continued down to the middle of 1835.

The defendant insists that all the items, on both sides, that are dated more than six years before the 28th of April 1838, are to be rejected, and so asks the court to instruct the jury; which instruction the court refuse to give, but instruct the jury that where there have been mutual, current, and unsettled dealings and accounts between the parties, those items, as in·this case, after six years, will draw after them the items that are prior.

The defendant excepted to the charge.

*Benedict*, for plaintiff in error, cited 12 *Peters* 308, 336.

*Hale*, for defendant in error, cited 2 *Mass.* 220, 221; 4 *Bac. Abr.* 478, *E. pl.* 3; 1 *Day* 245; 6 *T. R.* 189; 2 *Saund.* 127 *n.*; *Blanch. on Lim.*, 2 *Law Lib.* 88, 89.

The court affirmed the judgment on the principles which ruled the case of *Van Swearingen* v. *Harris* (356 *ante*).

KENNEDY, J. dissented from the opinion of the court in this case, and in the case of *Van Swearingen* v. *Harris*.

KENNEDY, J. *dissenting*—The court below were no doubt right in admitting the account, as kept by the plaintiff in his book against the defendant, to be read in evidence. The plaintiff, after being sworn, testified that the book was his book of original entries; and that each of the entries, in the account *against the* defendant, was made at the time of its date. The defendant, however, objected to the book, or the account being given in evidence from it to the jury, because it was kept in the form of a ledger. Books of original entries are frequently kept after the manner of the plaintiff's book, by such as farmers and mechanics, who may be unacquainted with the more regular and correct form of keeping books of account; or having but little occasion for such books, may think it more convenient to make one only answer their purpose. Such books, when authenticated by the oath of the party who made the entries therein, as was done in this case, and no other objection is made to appear against them, have been uniformly received in evidence. The plaintiff in error, who was the defendant in the court below, has therefore failed to sustain his first error.

The second error, however, appears to me to rest upon ground that cannot be removed or got over. Neither of the parties in this action appears to be a merchant, nor the factor or servant of such. But the point raised by the second error assigned, may be divided into two questions. First, does the Act of the 27th of March 1713, limiting the bringing of personal actions, extend to an action upon account and upon the case, which has no concern

[Thomson v. Hopper.]

with the trade of merchandise between merchant and merchant, their factors or servants? and, secondly, if it does, will the circumstance of there being mutual accounts between the parties, in which some of the latter items, on both sides, come within six years of the time of commencing the action, be sufficient to take the whole of the plaintiff's claim out of the Act? The words of the Act, in this respect, are, "all actions of account, and upon the case, (other than such accounts as concern the trade of merchandise between merchant and merchant, their factors or servants,) shall be sued for within six years next after the cause of action or suit, and not after." Our Act of Limitations, in regard to this particular, is an exact transcript of the statute of 21 *Jac.* c. 16, *sec.* 3. Now I think it is perfectly clear, that the case before the court, neither of the parties being merchants, does not fall within the exception, but comes directly within the express terms of the Act. It is possible that in the time of James I., when the English statute was passed, the term "merchant" was only applied to one who traded beyond sea. For the Lord Keeper, in *Sherman* v. *Withers*, (21 *Car.* 2, 1 *Chan. Ca.* 152), held that the exception in the statute did not apply to an *inland* merchant and his factor; but only to *merchants trading beyond sea*. And so thought Atkyns, J., in *Farrington* v. *Lee*, (1 *Mod.* 270). Notwithstanding, however, this may possibly have been the meaning affixed to the term "merchant" at the time of the passage of the statute of James, yet afterwards, and before the passage of our Act, it would seem to have had a more comprehensive signification given to it; for in *The Mayor, &c.* v. *Wilks*, (2 *Salk.* 445, 3 *Anne*) Lord Holt says, "A merchant includes all sorts of traders, as well and as properly as merchant adventurers. A merchant tailor is a common term." But still it would seem as if the precise meaning of the term, as used in the exception of the statute, has never been fully settled in England. And this, I apprehend, may be in part owing to merchant's accounts having been for many years carried to courts of equity; but chiefly from a prejudice that existed on the part of courts against the fair operation of the statute in case of debts founded upon simple contract, which induced them to construe the most trifling things and circumstances into promises and acknowledgments, whereby they considered the debts revived, and thus taken out of the statute. Indeed, it would appear as if nothing short of some undue prejudice, in this respect, could have induced courts to depart, as they did, from the plain letter of the Act, and doubtless the plain meaning, too, even so far as to allow an express promise to take a claim for a debt out of it. Chief Justice Bridgman looked upon this statute in its true light when, in 1664, only 41 years after its passage, he observed, in the case of *Benyon* v. *Evelyn*, (*O. Bridgman's Rep.* 363), "*Expedit reipublicæ ut sit finis litium*, it is better to suffer a particular mischief than a general

I.—2 p

inconvenience; and such a one must happen, if way be given to equitable constructions against the letter of the Act, which is, that they shall be sued within six years after the cause of action. But it rests not there, but adds, 'and *not* after;' which negative words are the strongest that can be in law." Had judges subsequently entertained the same view of the statute that Chief Justice Bridgman did, which was unquestionably the correct one, the construction and operation of it would have been such as the legislature intended, and certainly very different from that which has prevailed. But courts seem to have supposed, for they have occasionally said so, that the legislature only meant to protect persons who had paid their debts, where, from length of time, they had lost or destroyed the proof of payment. But " from the title of the Act to the last section," says Chief Justice Best, in *A'Court* v. *Cross*, (3 *Bing.* 329), " every word of it shows that it was not passed on this narrow ground. It is, as I have often heard it called by great judges, an Act of peace. Long-dormant claims have often more cruelty than justice in them. Christianity forbids us to attempt enforcing the payment of a debt which time and misfortune have rendered the debtor unable to discharge. The legislature thought that if a demand was not attempted to be enforced for six years, some good excuse for the non-payment might be presumed, and therefore took away the legal power of recovering it. I think if I were now sitting in the *Exchequer Chamber*, I should say that an *acknowledgment of a debt*, however *distinct* and *unqualified*, would *not* take from the party who makes it the protection of the statute of limitations." This same learned judge had, in a previous case, *Ham* v. *Reynall*, (2 *Bing.* 306) said, "The statute, after the limitation of three years from the passing of the Act, and six years from the cause of action, adds 'and not after;' looking at these words, 'and not after,' one might be led to conclude, that *in no instance* could a remedy for a debt be had after six years"; and certainly no stronger words could have been used. And, indeed, in no case embraced within the same clause of the statute, except the case of *assumpsit*, or debt founded on a simple contract, was it ever held, or even supposed by any one, that redress could be had by action, after six years had run from the cause of action accrued. Albeit, several other causes of action are mentioned in the same section, and directed to be brought within the same time, *and not after;* for instance, "actions upon the case (other than for slander) for trespass, detinue and replevin for goods or cattle," &c., it has certainly never been ruled that any of these actions could be maintained, after a lapse of six years from the time the cause of action accrued, upon any ground whatever.

But why an acknowledgment, or some device of the sort, should not have been resorted to, or found out, to evade the operation of the statute in these latter cases, as well as in the cases of *assumpsit*,

[Thomson v. Hopper.]

or debt founded upon simple contract, it is difficult to imagine, unless it be that it was thought that it would be too barefaced an evasion of the statute; for, as regards the equity of either case, the man who takes from another his property wrongfully, or obtains it by fraudulent means, is bound as much, in good conscience, to make full compensation to the owner for it, as if he had obtained it by his consent, upon a promise to pay him a certain price for it. But in the former of these cases, the courts have uniformly held the statute to be a bar to the plaintiff's recovering, unless the action be commenced within six years after the cause of action first accrued; and that an acknowledgment by the defendant that he is responsible to the plaintiff, or a promise that he will pay him for the property taken, will not take the case out of the statute of limitations. *Short* v. *M'Carthy*, (3 *Barn. & Ald.* 626); *Hurst* v. *Parker*, (1 *Barn. & Ald.* 92). But it would seem as if the courts and judges at first were somewhat sensible of the imperative language of the statute, for they did not dare to hold that an acknowledgment of the debt by the defendant, without an *express promise* to pay it, was sufficient to take the case out of the statute. In *Bass* v. *Smith*, (12 *Vin. Abr.* 229), and *Dickson* v. *Thompson*, (2 *Show.* 126), it was ruled by Chief Justice Scroggs, there must be an *express* promise to take the case out of the statute; and that a mere *confession* or *acknowledgment* by the defendant that he owed so much to the plaintiff, would not do it. See also *Lacon* v. *Briggs*, (3 *Atk.* 107); *Bland* v. *Haselrig*, (2 *Ventr.* 151, 152). At length, however, in the celebrated case of *Heylin* v. *Hastings*, (10 *Will.* 3. *B. R. Com. Rep.* 54), which was *assumpsit* for goods sold and delivered, where the defendant pleaded *non assumpsit infra sex annos;* and the evidence was, that the goods were sold and delivered to the defendant in the year 1688; that within three years of the time of trial, but more than six years after the cause of action had accrued, the defendant promised, if the plaintiff would prove his debt, he would pay it; it was held by the court, after consultation with all the other judges of England, in which ten of them concurred, that the promise took the case out of the statute. And they likewise agreed, that if a man *acknowledge* a debt after six years elapsed, it was evidence of an *assumpsit* upon *non assumpsit infra sex annos* pleaded, for the jury to find a verdict for the plaintiff, but not a matter upon which the court, if it were found specially, could give a judgment for the plaintiff. The latter opinion of the judges laid the foundation for what became the settled rule on the subject, by the decision of Baron Price, at Lent Assizes, in 1717, nearly one hundred years after the passage of the Act, that an acknowledgment of the debt was sufficient to take the case out of the statute of limitations. 12 *Vin. Abr.* 192. But a seeming disregard of the statute continued still to increase, so that whatever could be tortured into the slightest semblance of an acknowledgment, was held sufficient to take the

[Thomson v. Hopper.]

case out of the statute of limitations; as, for instance, saying, "I am ready to account, but nothing is due to you," *Yea* v. *Fouraker*, (2 *Burr.* 1099); or "what an extravagant bill you have delivered!" *Lawrence* v. *Worrall*, (*Peake's N. P. C.* 93). And thus the aberrancy on the part of the courts, from the course pointed out by the statute, increased until at length the defendant's saying, "he would not pay, there were none paid, and he did not mean to pay unless obliged," *Dowthwaite* v. *Tibbut*, (5 *Maule. & Selw.* 75); or, upon being arrested for the debt, "that it was true that the plaintiff had paid money for him, twelve or thirteen years ago, but that he had since become a bankrupt, by which he was discharged, as well as by law from the length of time," *Clark* v. *Bradshaw*, (3 *Esp. Rep.* 157); or acknowledging that he accepted the bill upon which the suit was brought, but saying, "that it was out of date, and also that it was not in his power to pay it," *Leaper* v. *Tatton*, (16 *East* 420) was held sufficient to take the case out of the operation of the statute. Now, although it is perfectly clear from all that the defendants said in these last cases, that neither the courts nor jury could infer a promise to pay, because the defendants, in express terms, declared their determination not to pay, yet, because they acknowledged the debts to have existed, without their having been actually paid, the statute of limitation was held to be no protection.

The courts in England having thus, in effect, nearly repealed, or set the statute aside, it is not at all surprising that it should have been decided, that where there are mutual items of account, between the plaintiff and defendant, every new item and credit in an account given by one to the other, is an admission of there being some unsettled account between them, the amount of which is afterwards to be ascertained, and therefore proper to be referred to a jury, who may consider it such an acknowledgment as will take it out of the statute. This principle, I think, was established for the first time in *Catling* v. *Skoulding*, (6 *Term Rep.* 189) and made to rule that case. But I am not aware that it was ever advanced in any previous case, unless it were in a case by Lord Hardwicke, which will be noticed in the sequel, or that it has been followed in any subsequent one in England. The case put by Justice Dennison, in *Cotes* v. *Harris* (*Bull. N. P.* 149, 150), is the case of mutual accounts between merchants, which, as he conceived, was perhaps the only case that came within the clause of the statute which excepts merchants' accounts from its operation. So the case of *Cranch* v. *Kirkman*, decided by Lord Kenyon (*Peake's N. P. C.* 121), was one of mutual accounts between merchants or traders at least, which he thought came within the exception; so that the principle of *Catling* v. *Skoulding* is not laid down or recognised in either of these cases. And, indeed, if any inference is to be drawn from them on the subject, it is rather, that mutual accounts between others than merchants or traders, would come within the operation of the statute, and

[Thomson v. Hopper.]

be thereby barred, so far as the items thereof were of more than six years' standing anterior to the bringing of the suit.

Thus, the courts of England, by permitting evidence to be given to prove promises and acknowledgments in order to defeat the statute and by distorting the conduct of the parties in the case of mutual accounts, into an acknowledgment for the like purpose, compelled Chief Justice Gibbs, in *Hellings* v. *Shaw*, (7 *Taunt*. 611), to say, " that if the courts could retrace their steps, and see all the consequences that have arisen, they would have seen it was better to adhere to the precise words of the statute, than to attempt to relieve in particular cases." And indeed, finally, the shameful evasion of the statute, by the courts in England, induced the legislature to enact, by the statute of 9 *Geo.* 4, *c.* 14, " that in actions of debt, or upon the case grounded upon any simple contract, *no acknowledgment* or *promise*, by words only, shall be deemed sufficient evidence of a new or continuing contract, whereby to take the case out of the operation of the said enactments (meaning 21 *Jac.* 1. *c.* 16, and the Irish Act of 10 *Car.* 1. *Sess.* 2. *c.* 6, both previously mentioned), or either of them, or to deprive any party of the benefit thereof, unless such *acknowledgment* or *promise* shall be made or contained by or in some *writing*, to be *signed* by the *party chargeable thereby.*"

Now although it be true, that we have, in the construction of our Act of Limitations, followed the English courts in the construction of their statute, so far as to hold an express promise made by the defendant to pay, or an acknowledgment of the debt made by him in a manner showing that he is willing to pay, from which a promise to that effect may be fairly inferred by the jury, yet we have never gone so far as to hold that an acknowledgment, by the defendant, of the debt made in a manner or under circumstances indicating that he is not bound or willing to pay it, was sufficient to take the case out of the statute; on the contrary, we have refused to follow the English decisions in this respect, and have held, that nothing short of a plain, unequivocal promise to pay, or an acknowledgment of the debt clearly proven, from which a promise to pay it may be fairly inferred, necessarily, in short, implied, will be sufficient to take it out of the operation of our Act of Limitations. And in no instance, upon principle of analogy, shall or ought a plaintiff to be permitted to recover money upon a doubtful promise or title of any kind. It is incumbent upon him to establish his right clearly, for if a reasonable doubt remains in regard to it, he ought not to recover. This I take to be the principle which has governed the decisions of this court, and more especially the late ones, in regard to the promise or acknowledgment that shall be deemed sufficient to take the case out of our Act of Limitations. It must be distinctly made and clearly proven. We have never decided that mutual accounts between the parties, not being merchants within the exception of the Act, some of the

items of which were within the six years, were sufficient to take the whole amount out of the operation of the Act. Some of the sister states may have adopted this principle as it is laid down in *Catling* v. *Skoulding*. The Supreme Judicial Court of Massachusetts seem to have done so in the case of *Cogswell* v. *Dolliver*, (2 *Mass. Rep.* 217), without any examination, as would appear from the report of the case, of the ground or reasonableness of it. See also *Buntin* v. *Logan*, (1 *Blackf. Rep.* 373), and *Bennett* v. *Davis*, (*Adams, or* 1 *New Hamp. Rep.* 19.) Mr Justice Story, however, in *Spring* v. *Gray*, (5 *Mason's Rep.* 523, 524), where a question on the Statute of Limitations of the state of Maine, which is a transcript of 21 Jac. 1. c. 16, was presented for his consideration, condemns in pretty strong terms the ingenious subtlety of judges and courts, which had been exercised for the purpose of evading the fair operation of the statute, according to its letter and tenor. He regards it, as it most certainly is, a statute of repose, and as most highly beneficial to the great interests of the community; and as such entitled to receive, if not a liberal, at least a reasonable construction in furtherance of its manifest object. " Yet," says he, " I well remember the time, when courts of law exercised, what I cannot but deem a most unseemly anxiety to suppress the defence, (meaning the defence set up under the statute); and when, to the reproach of the law, almost every effort of ingenuity was exhausted to catch up loose and inadvertent phrases from the careless lips of the supposed debtor, to construe them into *admissions* of the debt. It appears to me that it is the duty of the court to *adhere to the very terms of the statute*, and not, upon *imaginary* equitable considerations, to escape from the positive declarations of the text. No exceptions ought to be made, unless they are found therein; and if there are any inconveniences or hardships growing out of such a construction, it is for the legislature, which is fully competent for that purpose, and not for the court, to apply the proper remedy."

These imaginary equitable considerations here spoken of by Mr Justice Story, seem to lie at the foundation of the rule laid down by Lord Kenyon, and adopted by the other members of the court, in *Catling* v. *Skoulding*; for, after stating the rule to have been settled as long as he had any memory of the practice of the court, he adds as a reason why it should not be then overturned, that " daily experience teaches us, that if this rule be now overturned, it will lead to infinite injustice." The rule as stated is, " that every new item and credit in an account given by one party to the other is an admission of there being some unsettled account between them, the amount of which is afterwards to be ascertained; and any act which the jury may consider an acknowledgment of its being an open account, is sufficient to take the case out of the statute."

Now it does appear to me, that not only the " infinite injustice"

which Lord Kenyon thinks would take place, if the rule were overturned, but likewise the fact of the rule's having been settled in practice, as stated by him, is altogether *imaginary.* For surely, if it had been settled in practice, as he alleges, we would have frequent mention made of it in the books. But I am not aware of any book or case then in print in which its existence is mentioned. It is true, however, that afterwards, in the report of *Forster* v. *Hodgson,* (19 *Vez.* 185), Lord Eldon says, that by a note of a very experienced practitioner of that court, Lord Hardwicke is represented to have said on the 9th of July 1837, " that the exception as to merchants' accounts is not to be confined to open accounts merely; for *between common persons, as long as the account is continued, the statute does not bar;* the exception must, therefore, mean something more." And the note adds, that Lord Hardwicke seemed to think that between merchants an open account would do, though there had been no dealing within six years. But that Lord Hardwicke ever expressed or entertained such an opinion may well be doubted; for in *Welford* v. *Liddel,* (2 *Vez.* 400), he gives a different one; holding, that merchants' accounts will be barred if there is no item within six years; and the same doctrine, says Lord Eldon, is to be found in several other cases. *Forster* v. *Hodgson,* (19 *Vez.* 186).

In *Barber* v. *Barber,* (18 *Vez.* 286), Sir Wm. Grant determined that the Statute of Limitations was a bar to merchants' accounts; all the accounts having ceased six years. So in *Bridges* v. *Mitchell,* (*Gilb. Eq. Rep.* 224), a decision to the same effect was previously made.

But if mutual and open accounts, between common persons, be held not to be barred by the statute, as long as some of the items are charged within six years, though all the rest, forming the chief part in amount of the items in the accounts, be above six years, it is obvious that this is placing them on the same footing with merchants' accounts, which cannot be done, without a plain and palpable violation of both the letter and spirit of the Act; for the legislature have thereby, in express terms, excepted the one from the operation of the Act, and not the other. It would then seem that there is not only a want of evidence going to show that the rule adopted by the court in *Catling* v. *Shoulding* was founded upon the practice of the courts, but that all their previous decisions, as also the decisions made since that, so far as they are to be found having any bearing on the point, tend strongly to prove the contrary. In the next place, how is it, I would ask, that every new item and credit in an account given by one party to the other, can be made out an *admission* of there being some unsettled account between them, the amount of which is afterwards to be ascertained? Certainly in contemplation of law, or by force thereof, there is no such admission made, nor is any such necessarily made in fact, otherwise it would have been unnecessary to have provided in our Act of defalcation, passed only eight years before our

[Thomson v. Hopper.]

Act of Limitations, for the case of two or more dealing together, who have become indebted to each other upon accounts or the like, that it shall be lawful for the one, under the plea of payment, if sued by the other, to give his account against the plaintiff in evidence to the jury, that they may set it off against the plaintiff's, and having ascertained the amount of each account, strike the balance, if there be any, between the parties. Now, it is manifest that this provision could not have been necessary, if the mere existence of mutual and open accounts between the parties naturally implied, or in fact involved such an admission as that mentioned in the rule, which, if made at all, must be regarded as equivalent to an agreement between them, that there should be a future settlement of their mutual accounts, whereby the amount should be ascertained, and the balance struck. For such an admission or agreement would have given to the defendant the right of set-off as effectually as the Act does. The truth is, that such accounts, though mutual, are perfectly distinct and independent, and never have been regarded as having any connexion, unless there be an express agreement of the parties to that effect, and, if there be, it must be proved before it can have any such effect, and can never be presumed for such purpose. Neither can the creditor's subsequently buying any thing from his debtor, on credit, be considered as an acknowledgment on the part of the latter of his indebtedness to the former, so as to take the first debt out of the statute afterwards, when six years shall have run; nor into an acknowledgment according to the language of the rule, of there being an *open* account, which remains to be settled between them, and which, as the court say, " is sufficient to take the case out of the statute." All, therefore, that is contained in the rule, is certainly *imaginary;* for mutual credits obtained, in the manner just stated, were ever considered as creating substantive and independent debts, having no reference to or connexion with each other; and consequently could not, at common law, be set-off against each other without proof being made of an express agreement between the parties that it should be so. Besides, having shown already, that every item above six years' standing, of even an *open* and mutual account, is within the express terms of the statute, unless in such accounts as concern the trade of merchandise, *between merchant and merchant, their factors or servants,* the rule in this respect, if an *open* and mutual account is to be considered by it as sufficient to take the case out of the statute, would appear to be in direct opposition to the plain meaning of the statute, by rendering the exception contained therein, which is very explicit and unambiguous, even worse than useless, for it completely abrogates and sets it aside. And, indeed, I am not aware, that the rule, as laid down and adopted by the court in *Catling* v. *Skoulding,* has ever received the sanction of any of the courts in England since the determination of that case. But it is pretty clear

[Thomson v. Hopper.]

from what Best, Chief Justice of the King's Bench, says in *A'Court* v. *Cross*, (3 *Bing*. 329) that he, without hesitation, when sitting in the Exchequer Chamber, as an appellate court, would have decided against any such rule or principle. For he declares there, "I think, if I were now sitting in the Exchequer Chamber, I should say that an *acknowledgment* of a debt, however *distinct* and *unqualified*, would not take from the party who makes it, the protection of the statute of limitations." This it is evident would be cutting the rule in *Catling* v. *Skoulding* up by the roots. But the truth is, that mutual and open accounts do not even furnish pretence for the existence of such an acknowledgment. Seeing, then, that the rule laid down in *Catling* v. *Skoulding* has never been adopted here or received the sanction of this court, and that it would be a direct evasion of our Act of Limitations to adopt it; and at the same time, if adopted, would produce great litigation and injustice, by promoting delay in the settlement and adjustment of open and mutual accounts, until it had, from lapse of time, become impracticable to determine correctly, in cases of dispute between the parties, how the same ought to be settled according to the truth of the case, it ought therefore to be rejected by us. But the court below having adopted this rule in their charge to the jury, and the latter having found a verdict in conformity to it, the judgment, in my humble opinion, ought to be reversed.

Judgment affirmed.